UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WILLIAM LAMB,

               Plaintiff,                       Civil Action No. 10-cv-14645

      v.                                District Judge Patrick J. Duggan
                                         Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

               Defendant.
_____/

**REPORT AND RECOMMENDATION**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [7, 11]**

Plaintiff William Lamb ("Plaintiff" or "Claimant") brings this action pursuant to 42 U.S.C. § 405(g) challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act. Both parties filed summary judgment motions (Dkts. 7, 11), which are presently before this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) (Dkts. 3, 8).

**I. RECOMMENDATION**

For the reasons set forth below, this Court finds that, without a more detailed explanation from the Administrative Law Judge regarding his finding that Plaintiff has moderate limitations in concentration, persistence, or pace, his hypothetical and RFC assessment did not accurately capture that limitation. Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be GRANTED IN PART, that Defendant's Motion for Summary Judgment be DENIED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner be

REMANDED.

## II.  REPORT

### A.  Procedural History

On January 7 and January 17, 2008, Plaintiff filed respective applications for DIB and SSI, asserting that he became unable to work on June 1, 2005.  (Tr. 13.)  The Commissioner initially denied Plaintiff's disability applications on May 14, 2008.  (Tr. 13.)  Plaintiff then filed a request for a hearing, and on December 11, 2009, he appeared with counsel via video before Administrative Law Judge ("ALJ") Paul Armstrong, who considered the case *de novo*.  (Tr. 32-67.)  In a January 5, 2010 decision, the ALJ found that Plaintiff was not disabled.  (Tr. 13-25.)  The ALJ's decision became the final decision of the Commissioner on November 9, 2010 when the Appeals Council denied Plaintiff's request for review.  (Tr. 1.)  Plaintiff filed this suit on November 22, 2010. (Dkt. 1.)

### B.  Background

Plaintiff was 41 years old on the alleged disability onset date and 46 at the time of the ALJ's decision.  (*See* Tr. 13, 149.)  He completed ninth grade but only reads and writes at the third-grade level.  (Tr. 39, 220.)  Plaintiff previously worked as a custodian.  (Tr. 216.)

Plaintiff applied for disability benefits on the basis of physical and mental impairments, including, knee arthritis and bipolar disorder.  (Tr. 215.)  On appeal to this Court, however, Plaintiff challenges only the ALJ's findings regarding his mental impairments and the side effects of his medications.  (*See* Pl.'s Mot. Summ. J. at 8-9.)  Accordingly, the Court summarizes the hearing testimony and medical evidence only insofar as it pertains to Plaintiff's mental condition and his medications.

### 1. *The Hearing Before the ALJ*

#### (a) *Plaintiff's Testimony*

Plaintiff has a history of drug and alcohol abuse but testified that it was after his substance abuse ceased that he "started to go downhill." (Tr. 35-36.) Plaintiff testified that he has made efforts to find work but these efforts "crumbled." (Tr. 38.) According to Plaintiff, although a Michigan rehabilitation service advised him to go back to school, this required tutoring to raise his reading level. (Tr. 38-39.) But, Plaintiff said, "I couldn't get a tutor. So everything that I seem[ed] to try . . . just crumbled." (Tr. 39.) Plaintiff also testified that at one point a library found him a tutor but "I don't know what went wrong with that. It just all fell down . . . I just did the best I could, you know. And then I just gave up hope . . . because I feel like . . . as much as I try . . . it ain't doing nothing." (Tr. 41.)

Regarding his mental impairments, Plaintiff testified to having suicidal thoughts. (Tr. 53.) But he also stated that he had these thoughts "really since childhood." (Tr. 53.) Plaintiff also provided that his wife told him that he cries in his sleep. (Tr. 57.) In explaining that he experiences chest pains due to asthma, he also noted that they were attributable to anxiety attacks. (Tr. 64.)

Plaintiff also testified about side effects from his medications. He said that because of his medications he "sometimes" needs reminders to complete tasks. (Tr. 45.) Plaintiff also provided that his medication makes him irritable, dizzy, and gives him headaches. (Tr. 46.)

Regarding his activities of daily living, Plaintiff testified that he lives with his wife in an apartment. (Tr. 34.) Although Plaintiff's wife is on disability, she completes most of the household tasks. (Tr. 43-44.) Plaintiff assists in some chores, like washing dishes, but testified that he was limited to 15 or 20 minute tasks because of his physical impairments. (Tr. 45, 47-48.) On a typical

day, Plaintiff "stay[s] mostly to [him]self" and "watch[es] TV or things of that matter." (Tr. 52.) When the ALJ asked Plaintiff about a reference in the record about working with his hands and on puzzles, Plaintiff testified that he likes to draw "a little" (e.g., a "Snoopy") and worked on jigsaw puzzles that "take me some time . . . to do." (Tr. 37, 50-51.)

*(b) Vocational Expert's Testimony*

Vocational Expert ("VE") Carry Senoa also testified at the December 11, 2009 hearing. The ALJ asked Ms. Senoa to consider "a hypothetical individual limited basically to simple, unskilled, sedentary work, no overhead work with the left-hand dominant arm." (Tr. 63.) She testified that such an individual could work as a hand packager, bench assembler, or visual inspector/sorter with thousands of such positions in the regional labor market. (Tr. 63-64.)

The ALJ then asked the VE to consider some alternative hypotheticals. The VE said all competitive employment would be precluded if the above individual was further limited by "interference with concentration caused by side effects of the medication, . . . hearing voices and anxiety and the like, [such that he] would be unable to stay on task or concentrate an average of 15 minutes out of every hour." (Tr. 65.) Similarly, an added limitation of no "contact with anybody because they distract him too much and/or [cause him to] get mad or cause a fuss[,] [such that] he couldn't deal with anybody any time" would preclude work. (Tr. 66.) But the VE said that a less severe limitation of "superficial contact with supervisors, co-employees and the general public" would not preclude work. (Tr. 66.)

*2. Medical Evidence*

The record contains limited evidence of a mental impairment prior to October 2007. At an April 2007 physical exam, Plaintiff mentioned panic attacks. (Tr. 365.) In August 2007, a medical

4

provider noted "[d]epression/[i]nsomnia." (Tr. 358.) Around this time Plaintiff stopped using drugs. (Tr. 270.)

On October 2, 2007, Plaintiff reported to New Center Community Mental Health Services ("New Center") on the advice of his primary-care physician. (Tr. 269.) Plaintiff had been having suicidal thoughts since September 30, and also mentioned to the intake social worker that he had been diagnosed with bipolar disorder in the past. (Tr. 269.)

On October 3, 2007, Dr. Swarn Mahajan at New Center completed an Initial Psychiatric Evaluation. (Tr. 270-71; *see also* Tr. 415-16.) Plaintiff reported that although he had been sexually abused as a child and depressed since then, his depression had worsened since becoming unemployed. (Tr. 270.) Plaintiff told Dr. Mahajan that he felt hopeless, wished he was not here, was waking frequently at night, and had crying spells. (Tr. 270.) Dr. Mahajan conducted a mental-status exam which was largely unremarkable: Plaintiff had a restricted affect, but denied delusional phenomenon and perceptual disturbances, was oriented, and had an "intact" memory with average verbal intelligence. (Tr. 271.) Dr. Mahajan diagnosed Plaintiff with major depressive disorder, recurrent, severe, without psychotic features, noted "partial" drug abuse, and assigned Plaintiff a Global Assessment Functioning ("GAF") score of 60 – a score in the moderate symptom range. (Tr. 271.)[1]

---

[1]A GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." AMERICAN PSYCHIATRIC ASSOC., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("*DSM-IV*") 30 (4th ed., Text Revision 2000). It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id*. at 32. A GAF of 60 indicates "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *DSM-IV* at 34.

Plaintiff continued treatment at New Center through January 2009. (Tr. 387-416, 419-22.) During this time, Plaintiff attended both group and individual therapy sessions. In a December 2007 individual session, Plaintiff informed social worker Camillia Charley that he enjoyed work and felt "stressed" and like "less than a man" because he was not working. (Tr. 263.) Plaintiff also worried about how his wife felt about his inability to provide. (*Id.*) Plaintiff was sleeping and eating without a problem, however, and during the session he was cooperative, maintained good eye contact, and laughed and smiled where appropriate. (*Id.*) Ms. Charley provided that Plaintiff "appears to be doing well and stable at this time. Presents to be a person who is capable of working and desires employment." (*Id.*)

In February 2008, Plaintiff had another therapy session with Ms. Charley. (Tr. 253.) Plaintiff expressed frustration and stress at home. (*Id.*) He stated, "I can't get a good job because I don't have a GED, [and I] can't get a GED because of my poor reading levels." (*Id.*) Ms. Charley observed that Plaintiff was "[e]motionally strained, but stable." (*Id.*) She concluded that Plaintiff presented "with mainly econ[o]mic problems at this time. [He] [a]ppears to be stable mentally and has maintained a regular routine of all medications." (*Id.*) At a later February 2008 session, Ms. Charley provided that while Plaintiff was not working a regular job, "[h]e has gained employment training through the Consumer Run program which provides him with a monetary stipen[d] bi-weekly. Also, he is active within Day Treatment groups to enhance his reading and comprehension skills." (*Id.*)

On March 20, 2008, Dr. R. Hasan, a psychiatrist, completed a review of Plaintiff's medical file and then examined Plaintiff on behalf of Michigan's Disability Determination Services ("DDS"). (Tr. 309-11.) Plaintiff reported that he had been diagnosed with bipolar disorder for over 12 years.

(Tr. 309.)  He also told Dr. Hasan that he heard voices, and had suicidal ideations, mood swings, and

a short temper.  (Tr. 309.)  Plaintiff provided that he had very few friends and did not get along well

with others.  (Tr. 309.)  Plaintiff's mental-status exam was largely unremarkable: his speech was

spontaneous and logical, his mood was calm, his affect appropriate, he could recall four numbers

backwards and forwards and one out of three objects after three minutes, he had problems with serial

sevens[2] but could do other basic calculations, and Plaintiff understood proverbs and answered a

judgment question appropriately.  (Tr. 311.)  Dr. Hasan found that Plaintiff's motor-activity and self-

esteem were low, however, and that Plaintiff had "no motivation."  (Tr. 310.)  He diagnosed Plaintiff

with major depressive disorder, recurrent, with psychotic features and noted to rule out bipolar

disorder.  (Tr. 311.)  Dr. Hasan assigned Plaintiff a GAF score of 55, which, like Dr. Mahajan's

score, is in the moderate-symptom range.  (Tr. 311.)

        On April 10, 2008, Dr. Daniel Blake reviewed Plaintiff's medical file, including the opinions

---

[2]In *Teal v. Comm'r of Soc. Sec.*, the Court summarized the purpose of the serial sevens test
as follows:

> "Serial sevens, counting down from one hundred by sevens, is a
> clinical test used to test mental function . . . [o]n its own, the inability
> to perform 'serial sevens' is not diagnostic of any particular disorder
> or impairment, but is generally used as a quick and easy test of
> concentration and memory in any number of situations where
> clinicians suspect that these cognitive functions might be affected."
> Wikipedia, http://en.wikipedia.org/wiki/Serial_sevens. To test
> "[c]oncentration and attention: Ask the patient to subtract 7 from 100,
> then to repeat the task from that response. This is known as "serial
> 7s." Brannon, Guy, *History and Mental Status Examination*,
> http://emedicine.medscape.com/article/293402–overview#
> aw2aab6b4. Plaintiffs response of "100, 97, 87, 80 and I don't know"
> would represent a score of "1," a very low score on the
> concentration/attention test. See http://attentionmmse.com/.

No. 10–13154, 2011 WL 4484864, at *1 n.2 (E.D. Mich. Sept. 26, 2011).

of Drs. Mahajan and Hasan, and then completed a Mental Residual Functional Capacity Assessment ("Mental RFC Assessment") and Psychiatric Review Technique Form ("PRTF") for Michigan's DDS. (Tr. 312-28.) On the PRTF, Dr. Blake indicated that Plaintiff had "moderate" limitations in the following three "B" Criteria associated with Listing 12.04 Affective Disorders: activities of daily living, social functioning, and maintaining concentration, persistence, or pace. (Tr. 326.) On the Mental RFC Assessment, Dr. Blake indicated that Plaintiff had a number of moderate functional limitations, including, moderate limitations in understanding detailed instructions and maintaining concentration for extended periods. (Tr. 312.) He indicated no "marked" limitations, however, and concluded that "while [claimant] is psychologically compromised, he is not so impaired as to preclude work. . . . [C]ompetitive skills adequately maintained[.] [Claimant's] mental functions retained sufficient for sustained work activity." (Tr. 314.)

As noted, Plaintiff continued to receive treatment at New Center through January 2009. On May 14, 2008, a New Center social worker indicated that Plaintiff was "[m]edication compliant, no side effects to report." (Tr. 396.) A May 21, 2008 progress report from New Center provides that Plaintiff was doing well. (Tr. 396.) Plaintiff's affect was appropriate and the New Center nurse noted that he was "stable on medication." (Tr. 396.) In his individual therapy session on June 18, 2008, Plaintiff reported trouble sleeping and anxiety due to financial troubles. (Tr. 394.) In December 2008, Plaintiff was seen by a New Center nurse and reported depression. (Tr. 421.) The nurse noted that Plaintiff was alert and oriented, his speech was clear and logical, and he had good eye contact and was in a cooperative mood. (Tr. 421.)

In April 2009, Plaintiff began treatment with Easter Seals of Michigan. (Tr. 440-87, 536-46.) On April 16, 2009, Laura Fischer, a clinical therapist or social worker at Easter Seals, completed an

8

intake assessment of Plaintiff. (Tr. 443-450.)  Plaintiff reported that his bipolar symptoms had increased since he stopped using drugs. (Tr. 443.)  He described his depression as "debilitating" with feelings of hopelessness and helplessness and his manic episodes as "all the energy in the world, my confidence shoots up, I stay awake." (Tr. 443.)  He reported once going without sleep for four days. (Tr. 443.)  Ms. Fischer found that Plaintiff was cooperative, his motor activity "unremarkable," that Plaintiff was not delusional, his mood was "normal," and his intelligence average. (Tr. 446.)  Her diagnosis was bipolar, most recent episode depressed, severe. (Tr. 448.)  She concluded that while Plaintiff "has case management and psychiatric needs," he "is able to function in the community." (Tr. 449.)  On April 18, 2009, Plaintiff saw Dr. Nair at Easter Seals for a medical review. (Tr. 440.)  Plaintiff reported that his depression came and went and that he had "dizziness." (Tr. 440.)

From May to August 2009 Plaintiff expressed suicidal ideations.  On May 28, 2009, Plaintiff spoke with an on-call Easter Seals social worker because of these ideations; the social worker noted depression but that there were no suicidal ideations during their conversation. (Tr. 483.)  On June 10, 2009, Plaintiff's case manager at Easter Seals noted that Plaintiff had some suicidal ideations but "[n]o mental health or medication concerns reported at this time." (Tr. 482.)  On August 17, 2009, Plaintiff reported feeling suicidal on a daily basis but had no plan: he said he did not want to kill himself or relapse into substance abuse because it would disappoint his wife. (Tr. 480.)

In September 2009, Plaintiff reported symptoms of depression to his therapist at Easter Seals and said that his coping skills have been limited in their effectiveness. (Tr. 469.)  In October 2009, Plaintiff's case manager reported, "[client] said his mental health has been OK and he is sleeping too much again." (Tr. 468.)

9

In December 2009, Dr. William Guy at Easter Seals completed a Psychiatric Evaluation of Plaintiff. (Tr. 536.) Plaintiff reported to Dr. Guy that was only sleeping two hours "here and there." (Tr. 536.) Plaintiff also said that a New Center psychiatrist had diagnosed him with bipolar disorder. (Tr. 536.) He reported racing, anxious thoughts during times of depression but did not remember ever staying awake for several days with exuberant energy. (Tr. 536.) Plaintiff also denied auditory or visual hallucinations or suicidal ideation "except for passive suicidal ideation." (Tr. 537.) Dr. Guy found Plaintiff to be friendly and cooperative with normal hygiene and memory. (Tr. 537.) He also found Plaintiff had "poorly fair" insight and judgment, however. (Tr. 537.) Dr. Guy diagnosed Plaintiff with bipolar disorder, not otherwise specified, and major depressive disorder, recurrent, severe with psychotic features. (Tr. 537.) Dr. Guy assigned Plaintiff a GAF score of 38. (Tr. 537.)[3]

Dr. Guy also completed a mental RFC assessment of Plaintiff in December 2009. (Tr. 538-540.) He found that Plaintiff had a number of "moderate" and "marked" functional limitations, including, marked limitations in Plaintiff's ability to maintain concentration for extended periods and Plaintiff's ability to complete a normal workday and workweek without psychologically-based symptoms. (Tr. 539.) Dr. Guy also opined that Plaintiff was moderately limited in his ability to understand, remember, and carry out simple instructions. (Tr. 539.) He provided that Plaintiff had a "substantial loss" – a term defined on the form as an inability to perform an activity in regular, competitive employment – in his ability to make judgments commensurate with functions of

---

[3]A GAF of 38 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." *DSM-IV* at 34.

unskilled work.  (Tr. 540.)

### C.  Framework for Disability Determinations

Under the Social Security Act (the "Act") Disability Insurance Benefits and Supplemental

Security Income are available only for those who have a "disability." *See Colvin v. Barnhart*, 475

F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any
> medically determinable physical or mental impairment which can be
> expected to result in death or which has lasted or can be expected to
> last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the

application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are
> denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments
> that "significantly limits . . . physical or mental ability to do basic work activities," benefits
> are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe
> impairment that is expected to last for at least twelve months, and the severe impairment
> meets or equals one of the impairments listed in the regulations, the claimant is conclusively
> presumed to be disabled regardless of age, education, or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied
> without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other
> work exists in the national economy that plaintiff can perform, in view of his or her age,
> education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th

Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the

11

analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.  The Administrative Law Judge's Findings

At step one, Administrative Law Judge Armstrong found that Plaintiff has not engaged in substantial gainful activity since June 1, 2005 – Plaintiff's alleged onset date. (Tr. 15.) At step two, he found that Plaintiff had the following severe impairments: osteoarthritis of the knees and left shoulder, obesity, bipolar disorder, depression, and history of substance abuse. (Tr. 15.) Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment. (Tr. 16-17.) Between steps three and four, the ALJ determined that Plaintiff had the residual functional capacity to perform "simple, unskilled sedentary work as defined in 20 CFR 404.1567(a), 404.1568(a), 416.967(a), and 416.968(a) except the claimant should avoid positions requiring overhead work with his left arm." (Tr. 17.) At step four, the ALJ found that Plaintiff could not perform any past relevant work. (Tr. 23.) At step five, the ALJ relied on VE testimony in response to his hypothetical, and found that work existed in significant numbers that Plaintiff could perform: hand-packager, bench assembler, and visual inspector/sorter. (Tr. 24.)

### E.  Standard of Review

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal

12

quotation marks omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." (internal quotation marks omitted)).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted); *see also Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted) (explaining that if the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, this Court is limited to an examination of the record and must consider that record as a whole.  *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council."  *Heston*, 245 F.3d at 535.  There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record.  *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." (internal

13

quotation marks omitted)).  Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

### F.  Analysis

Plaintiff essentially asserts that the ALJ committed two errors in concluding that he was not disabled.  First, Plaintiff claims that the ALJ incorrectly evaluated the opinion evidence by (1) adopting Dr. Blake's conclusion but not his reasoning, and by (2) rejecting "opinions from . . . Plaintiff's treating psychiatrist[s] without good reason."  (Pl.'s Mot. Summ. J. at 11; *see also id.* at 9-14.)  Second, Plaintiff argues that the ALJ crafted an inaccurate hypothetical for the VE because the limitation of "simple, unskilled" work does not "establish the limits of [P]laintiff's employability from a mental standpoint."  (Pl.'s Mot. Summ. J. at 15.)  Plaintiff further argues that the ALJ failed to account for functional limitations caused by the side effects of his medication.  (Pl.'s Mot. Summ. J. at 17-18; *see also* Dkt. 12, Pl.'s Resp. to Def.'s Mot. Summ. J. at 6 (arguing that terms "simple, unskilled" do not account for medication side effects).)

### 1.  *The ALJ Did Not Err in Weighing the Opinion Evidence*

Plaintiff asserts that the ALJ twice erred in weighing the opinion-evidence.  First, he argues that the ALJ illogically credited Dr. Blake's conclusion that Plaintiff maintained the mental capacity to perform sustained work activity.  (Pl.'s Mot. Summ. J. at 10.)  Next, Plaintiff says that the ALJ improperly discounted the opinions of Plaintiff's physicians: Drs. Mahajan and Guy.  (Pl.'s Mot. for Summ. J. at 11.)  The Court finds no reversible error in these regards.

Regarding Plaintiff's first argument, Plaintiff rhetorically asks, "Can an ALJ base a finding

14

upon a conclusion he himself has found is based upon faulty reasoning that is inconsistent with the medical evidence?  That conclusion would not be supported by substantial evidence."  (Pl.'s Mot. Summ. J. at 10.)  Plaintiff directs the Court's attention to the following passage from the ALJ's narrative regarding the opinion of Dr. Blake:

> After his review of the claimant's records, Dr. Blake, a psychiatric consultant [for Michigan's DDS], found the claimant to possess a mental capacity sufficient for sustained work activity.  To support his conclusion, Dr. Blake cited the claimant's continued search for permanent employment and his independence in his activities of daily living.  The undersigned did not afford great weight to Dr. Blake's opinion because he adjudged the claimant to be moderately limited in his activities of daily living and social functioning; these conclusions are not entirely consistent with the claimant's psychiatric treatment records.  Nevertheless, the undersigned afforded Dr. Blake's opinion weight because his conclusion that the claimant remains capable of performing work related activities on a sustained basis is wholly consistent with the balance of the claimant's medical evidence.

(Tr. 18-19.)

The Court finds no reversible error in the ALJ's partial adoption of Dr. Blake's opinion.  Dr. Blake found that Plaintiff was more severely limited than did the ALJ: Dr. Blake believed that Plaintiff was "moderate[ly]" limited in activities of daily living and social functioning but the ALJ believed that Plaintiff was only "mild[ly]" limited in those two B Criteria.  (*Compare* Tr. 16 *with* Tr. 326.)  Yet, despite opining that Plaintiff was moderately limited in certain regards, Dr. Blake nonetheless concluded that Plaintiff was "not so impaired as to preclude work" and that he retained mental functioning "sufficient for sustained work activity."  (Tr. 314.)  Thus, the portions of Dr. Blake's opinion that the ALJ rejected were not those essential to his conclusion – Dr. Blake reached his conclusion despite his "moderate" findings.  It is not illogical to adopt a conclusion and reject nonessential underlying rationale.

15

Plaintiff's second opinion-evidence argument is that the ALJ improperly discounted the opinions of "treating sources, Drs. Mahajan and Guy" and erroneously weighed the opinion evidence in this case.  (Pl.'s Mot. Summ. J. at 14.)  But the Court finds unwarranted Plaintiff's assumption that Drs. Mahajan and Guy are treating sources as that term is used in the Social Security regulations.

Under the applicable regulations, an ALJ is generally to accord the opinion by a claimant's treating source great (and possibly controlling) weight.  This is so because:

> [treating] sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *see also Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994) ("The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records.").  Given the rationale behind the treating-source rule, it follows that not every physician who treats a claimant is a treating source.  *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007) ("[20 C.F.R. § 404.1527(d)] recognizes that not all medical sources need be treated equally, classifying acceptable medical sources into three types: nonexamining sources, nontreating (but examining) sources, and treating sources.").

In the Sixth Circuit, a single examination of a claimant by a physician or psychiatrist does not, as a matter of law, form the requisite treating-source relationship.  *Pethers v. Comm'r of Soc. Sec.*, 580 F. Supp. 2d 572, 579 n.16 (W.D. Mich. 2008) ("In our Circuit, as a matter of law, more

16

than one examination is required to attain treating-physician status."); *see also Kornecky v. Commissioner of Social Sec.*, 167 F. App'x 496, 506 (6th Cir. 2006) ("A plethora of decisions unanimously hold that a single visit does not constitute a treating relationship.").  Here, nothing suggests – and Plaintiff does not argue – that Dr. Mahajan ever evaluated or treated Plaintiff beyond the Initial Psychiatric Evaluation on October 2007.  In fact, at the time Dr. Mahajan authored that opinion, Plaintiff had just begun treatment at New Center.  *See Kornecky*, 167 F. App'x at 506 ("[T]he relevant inquiry is not whether [the examining doctor] might have become a treating physician in the future if [Plaintiff] had visited him again.  The question is whether [the physician] had the ongoing relationship with [Plaintiff] to qualify as a treating physician *at the time he rendered his opinion*.").  Accordingly, Dr. Mahajan's opinion was not entitled to treating source deference.

Dr. Guy presents a closer case.  The record reflects that Dr. Guy saw Plaintiff as many as three times.  It is clear that Dr. Guy evaluated Plaintiff in December 2009 when he completed a Psychiatric Evaluation and Mental RFC Assessment of Plaintiff.  (Tr. 536-37, 538-41.)  And Dr. Guy's December 2009 Psychiatric Evaluation report references an earlier exam and suggests a third:

> When he came to Easter Seals *and was seen by this author* and [w]as placed on Neurontin, he complained that his insomnia improved, but he was sleeping for 24 hours a day.  When he was switched to Seroquel XR, he said that he only slept for about four hours.

(Tr. 17 (emphasis added); *see also* Tr. 471 ("[Mr. Lamb] reported that the dosages he was first on for Seroquel and Neurontin [were] making him sleep too much.  This was discussed with Dr. Guy and [Plaintiff] was told to take [half] the dosage.").)  Although Dr. Guy's records associated with these two referenced visits are not in the record, it is reasonable to conclude that Dr. Guy examined and evaluated Plaintiff once in December 2009 and otherwise conducted two medication reviews.

The Sixth Circuit has stated, "depending on the circumstances and the nature of the alleged

17

condition, two or three visits often will not suffice for an ongoing treatment relationship."
*Kornecky*, 167 F. App'x at 507.  Here, the severity of Plaintiff's mental impairments are more
difficult to evaluate than, say, the severity of certain physical conditions that might be readily
revealed through diagnostic testing.  Dr. Guy at most saw Plaintiff over a 7-month period, and the
extent of the two pre-December 2009 exams are unknown but appear to have been merely
medication reviews.  Further, Dr. Guy's December 2009 Psychiatric Evaluation does not indicate
whether he reviewed Plaintiff's treatment records from New Center (although Plaintiff recounted
some of his treatment there), and it is also unclear whether he reviewed any of the notes by the social
workers and therapists at Easter Seals.  "In addition, an individual does not automatically qualify
as a treating source simply because they are employed at a facility where the claimant regularly
receives treatment." *McCombs v. Comm'r of Soc. Sec.*, No. 2:09-cv-332, 2010 WL 3860574, at *6
(S.D. Ohio Sept. 24, 2010).  Given the foregoing, the Court finds that the ALJ was not required to
accord Dr. Guy's December 2009 evaluation treating-source deference.  *See Kane v. Astrue*, No.
1:10CV1874, 2011 WL 3353866, at *5-6 (N.D. Ohio Aug. 3, 2011) (concluding, in the alternative,
that physician who conducted an initial mental-health exam followed by several short follow-ups
was not a treating source); *Sites v. Astrue*, No. 2:09cv26, 2010 U.S. Dist. LEXIS 97442, at *74-75
(N.D.W.Va. Aug. 4, 2010) (rejecting argument that psychiatrist was a treating source where
psychiatrist had examined the claimant once and conducted two 15-minute medication reviews over
a five-month period) *report adopted by* 2010 U.S. Dist. LEXIS 92484 (N.D.W.Va. Sept. 3, 2010);
*cf. Smith*, 482 F.3d at 876 ("[Plaintiff] claims her medical reports from . . . [Dr.] Shah deserve[s]
treating-source review.  We cannot agree. . . .  Shah examined [Plaintiff], completed a medical
report, prescribed and refilled back pain medication, and denied additional medication when

18

2:10-cv-14645-PJD   Doc # 13   Filed 12/01/11   Pg 19 of 37   Pg ID 655

[Plaintiff] returned seeking more."); *Walker v. Comm'r of Soc. Sec.*, No. 1:08-cv-450, 2009 WL
3126277, at *11 (S.D. Ohio Sep. 23, 2009) (finding that psychiatrist who competed mental RFC
assessment was not a treating source where psychiatrist only saw claimant three times over a
seven-month period and the visits "indicate[d] fairly insignificant treatment of Plaintiff's allegedly
disabling conditions").[4]

Because Drs. Mahajan and Blake were not treating sources, the ALJ was not required to give
their opinions special deference. Nor was the ALJ required to explain in great detail why he
discounted or rejected their opinions. *See Kornecky*, 167 F. App'x at 507-08 ("Here, [as compared
to the ALJ's treatment of the treating source opinion in *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541
(6th Cir. 2004)], the ALJ neither misstated nor ignored a treating physician's opinion; he merely
failed to explain why he favored several *examining* physicians' opinions over another's." (emphasis
added)). Accordingly, the Court may now turn to a modified version of Plaintiff's argument: the
"ALJ clearly erred in failing to grant great . . . weight[] to . . . Drs. Mahajan and Guy, and by further
failing to recognize evidence from them, buttressed by the very expert [the ALJ] deemed persuasive,
Dr. Blake, and by consultative examiner [Dr.] Hasan, that plaintiff suffered from significant mental
issues that would greatly limit his ability to perform work." (*See* Pl.'s Mot. Summ. J. at 14.)

---

[4]Even if the Court were to conclude that Dr. Guy was a treating source, the ALJ was not
required to treat his opinion with the same deference that would be accorded to a doctor with a much
more extensive treating relationship with a claimant. *See* 20 C.F.R. §§ 420.1527(d)(2), 416.927(d)(2)
("Generally, the longer a treating source has treated you and the more times you have been seen by
a treating source, the more weight we will give to the source's medical opinion. . . . Generally, the
more knowledge a treating source has about your impairment(s) the more weight we will give to the
source's medical opinion."). In particular – based just on Dr. Guy's relationship with Plaintiff – Dr.
Guy's opinion should not be accorded significantly more weight than, say, the opinions of Drs.
Mahajan and Hasan who also examined Plaintiff. Moreover, there are other factors an ALJ
considers in weighing medical opinions. *See* 20 C.F.R. §§ 420.1527(d), 416.927(d).

19

Although Plaintiff's proposed balancing of the opinion evidence – according great weight to the opinions of Drs. Mahajan and Guy – may be supported by substantial evidence, substantial evidence also supports the ALJ's view of the opinion evidence – including rejecting Dr. Guy's opinion.

As an initial matter, Dr. Mahajan provided no functional assessment of Plaintiff, and, accordingly, there was nothing specifically and directly inconsistent with his opinion and the opinion of Dr. Blake or the ALJ's RFC. Moreover, as will be discussed momentarily, substantial evidence suggests that Dr. Mahajan's evaluation is more in accord with Dr. Blake's than Dr. Guy's.

Turning to Dr. Guy's opinion, although close, substantial evidence supports the ALJ decision to reject the opinion.[5] (*See* Tr. 20-22.) First, as the ALJ reasoned in his narrative, Dr. Guy's mental-status exam of Plaintiff does not appear to support his rather extreme findings. During the exam, Plaintiff's orientation, recall, and speech were within normal limits, he denied hallucinations and delusions, and his memory was intact. (Tr. 537.) Although Dr. Guy also found that Plaintiff had passive suicidal ideation and "poorly fair" insight and judgment, taken as a whole, the ALJ could reasonably conclude that Dr. Guy's exam was inconsistent with his severe GAF score of 38, a finding of major depression "with psychotic features,"[6] and a conclusion that Plaintiff was unable

---

[5]In this Court's view of the evidence, Dr. Guy's opinion should not have been rejected altogether but perhaps been merely discounted in view of the other record evidence. Ultimately, however, this Court's opinion is largely irrelevant because it is not for this Court to re-weigh evidence but to simply ensure that the ALJ's weighing of the evidence was not unreasonable. *See Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted) (explaining that if the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion.").

[6]According to the Diagnostic and Statistical Manual of Mental Disorders,
    [t]he term psychotic has historically received a number of different

to make judgments associated with unskilled work in a regular, competitive employment setting. (Tr. 537, 544.)

Second, as the ALJ also reasoned in his narrative, there was other record evidence inconsistent with Dr. Guy's opinion – including the opinions of other doctors. For instance, in October 2009 – about two months before Dr. Guy's opinion – Plaintiff's Easter Seals case manager noted that "[client] said his mental health has been OK." (Tr. 468; *see also* Tr. 22.) The ALJ also relied on an evaluation by an Easter Seals therapist finding that Plaintiff was not delusional, his mood was "normal," and that, despite psychiatric needs, "[he] [was] able to function in the community." (Tr. 22, 443, 449.)

Additionally, the ALJ considered the opinion of Dr. Hasan, a psychiatrist who examined Plaintiff. (Tr. 20-21.) The ALJ recognized that Dr. Hasan's mental-status exam of Plaintiff was largely unremarkable, and that he had assigned Plaintiff a GAF score of 55 – indicating moderate symptoms. (Tr. 311.) The Court adds that Dr. Hasan's findings where made in view of reported symptoms similar to those Plaintiff reported to Dr. Guy: past bipolar diagnosis, few friends, hearing

definitions, none of which has achieved universal acceptance. The narrowest definition of psychotic is to delusions or prominent hallucinations, with the hallucinations occurring absence of insight into their pathological nature. A slightly less restrictive definition would also include prominent hallucinations that the individual realizes are hallucinatory experiences. Broader still is a definition that also includes other positive symptoms of Schizophrenia (i.e., disorganized speech, grossly disorganized or catatonic behavior). . . . In [earlier over-inclusive classifications], a mental disorder was termed "psychotic" if it resulted in "impairment that grossly interferes with the capacity to meet ordinary demands of life." The term has also previously been defined as "loss of ego boundaries" or a "gross impairment in reality testing."

*DSM-IV* at 297.

21

voices, suicidal ideations, and mood swings.  (Tr. 309.)

The ALJ also relied in part on Dr. Blake's conclusion about Plaintiff's ability to work.  And Dr. Blake's opinion of Plaintiff's functioning was less restrictive than Dr. Guy's in a number of significant respects: "not significantly" limited (Dr. Blake) versus "moderately" limited (Dr. Guy) in remembering and carrying out short and simple instructions; "not significantly" versus "moderately" limited in the ability to make simple work-related decisions; "not significantly" versus "markedly" limited in the ability to perform activities within a schedule; "not significantly" versus "markedly" limited in the ability to get along with coworkers.  (*Compare* Tr. 312-13 *with* Tr. 538-40.)  Although Dr. Blake did not examine Plaintiff as did Dr. Guy, he was a psychiatrist and he did rely on the reports of two in-person examiners: Drs. Mahajan and Hasan.

Finally, returning briefly to Dr. Mahajan, the Court notes that while Plaintiff asserts that his evaluation supports Dr. Guy's findings, Dr. Mahajan's mental-status exam was largely unremarkable and he assigned Plaintiff a GAF score of 60 – higher than that of Dr. Hasan and inconsistent with that of Dr. Guy.  (*Compare* Tr. 271 *with* Tr. 537.)[7]

In sum, Drs. Guy and Mahajan were not treating-sources and the ALJ was not required to give their opinions the associated heightened deference or explain at length why he discounted them.  Further, substantial evidence in the record supports the ALJ's decision to reject the opinion of Dr. Guy.  The Court finds no reversible error in the ALJ's treatment of the opinion evidence in this case.

_____

[7]Based largely on the GAF scores of Drs. Mahajan (60), Hasan (55), and Guy (38), Plaintiff argues that his condition worsened over time.  (Pl.'s Mot. Summ. J. at 13.)  But Drs. Mahajan and Hasan's scores are in the same DSM-IV range (moderate symptoms) and Dr. Guy made no mention of a worsening condition (indeed, given Dr. Guy's relatively limited treatment relationship with Plaintiff, it is doubtful he was in a position to do so).  Substantial evidence supports the ALJ's reading of the record: three different doctors gave three different GAF scores when Plaintiff reported similar symptoms to each and had similar mental-status exams.

>    2.  *The ALJ Erred By Failing to Adequately Account for His Own Finding that*
>    *Plaintiff had Moderate Deficiencies in Concentration, Persistence, or Pace*

"In order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments." *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010); *see also Varley v. Sec'y Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987); *cf.* S.S.R. 96-8p, 1996 WL 374184, at *2 ("[Residual functional capacity] represents the most that an individual can do despite his or her limitations or restrictions.").

Plaintiff argues that in limiting Plaintiff to only "simple, unskilled . . . work," the ALJ failed to accurately portray his mental limitations stemming from his depression and bipolar disorder. (Pl.'s Mot. Summ. J. at 15-16.)  More specifically, Plaintiff claims that the opinion evidence, even Dr. Blake's opinion, suggests mental limitations that the VE testified would be work-preclusive, or, at a minimum, circumscribe the set of simple, unskilled work available to Plaintiff.  (Dkt. 12, Pl.'s Resp. to Def.'s Mot. Summ. J. at 4-6.)  Plaintiff also asserts a narrower version of this argument: "even the limitation the ALJ himself set forth" – that Plaintiff was moderately limited in his ability to maintain concentration, persistence, or pace ("CPP") – "was not sufficiently accounted for in the hypothetical posed to the vocational expert."  (Pl.'s Mot. Summ. J. at 16-17; *see also* Def.'s Mot. Summ. J. at 13.)[8]  The Court begins with this latter point.

There is no shortage of decisions in this District addressing the claim that hypothetical

---

[8]"Concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." 20 C.F.R. pt. 404, subpt. P, app'x 1, § 12.00(C)(3).

23

limitations such as "simple, routine" and/or "unskilled" fail to account for a moderate deficiency in CPP. The parties rely on several such cases: Plaintiff points to decisions remanding to the Commissioner, Defendant relies on decisions affirming the ALJ's choice of hypothetical. Because the authorities cited by the parties are better understood against the backdrop of the Sixth Circuit Court of Appeal's decision in *Smith v. Halter*, 307 F.3d 377 (6th Cir. 2001), this Court begins there.

In *Smith*, the ALJ, as part of his decision, completed a checkbox PRTF indicating that the plaintiff "often" suffered from "deficiencies in concentration, persistence, or pace resulting in a failure to complete tasks in a timely manner." 307 F.3d at 379; *see also id.* at 378. The ALJ's hypothetical limited the plaintiff to "routine and low stress" jobs that did not involve "high quotas." *Id.* at 378. The underlying medical evidence included opinions of four physicians who believed that the plaintiff's concentration problems were minimal and a fifth physician who found that the plaintiff had the "inability to concentrate." *Id.* at 379. The Sixth Circuit found that the ALJ reasonably refused to credit the fifth physician's opinion, and, regarding the ALJ's hypothetical, concluded:

> The ALJ's "finding" [Plaintiff] relies on here – that [Plaintiff] "often" has problems concentrating that preclude him from completing tasks on time – was a single box the ALJ checked in a 1-5 rating scale on a standard psychiatric assessment form. But the ALJ went beyond this simple frequency assessment to develop a complete and accurate assessment of [Plaintiff's] mental impairment, as [*Varley*, 820 F.2d at 779] requires. In particular, the ALJ relied on the testimony of four physicians who characterized [Plaintiff's] concentration problems as minimal or negligible. The ALJ then translated [Plaintiff's] condition into the only concrete restrictions available to him – [an] examining psychiatrist . . . recommended restrictions against quotas, complexity, stress, etc. – and duly incorporated them into his hypothetical to the vocational expert.

*Id.*

24

This Court reads *Smith* to hold that when an ALJ makes a finding that the plaintiff "often" has difficulties in CPP (or has "moderate" CPP deficiencies), the ALJ need not include talismanic language such as "moderate concentrational difficulties" in his RFC assessment (or hypothetical to the VE) at least where the evidence demonstrates that the claimant's concentrational difficulties are negligible and alternate CPP-related language accurately portrays those minimal deficiencies. *Cf. Edwards v. Barnhart*, 383 F. Supp. 2d 920 (E.D. Mich. 2005) ("[W]hen the ALJ makes a PRTF finding that the claimant 'often' has problems with concentration, but does not specifically include that limitation in the hypothetical question, the question is whether the ALJ used adequate alternate concrete job restrictions in the hypothetical question that suitably accommodated the worker's concentration limitations.); *Bohn-Morton v. Comm'r of Soc. Sec.*, 389 F. Supp. 2d 804, 807 (E.D. Mich. 2005) ("To be sure, all of the ALJ's findings, including those [the ALJ] summarized on a PRTF, must be harmonized and incorporated into the hypothetical questioning of the VE. Yet, a particular assessment on a PRTF does not mandate a rigid checklist of restrictions that must be included in this questioning. Rather, a case-by-case determination is required, under which the ALJ must translate the broad PRTF classifications into a set of specific limitations that are properly rooted in the administrative record."). With this law in mind, the Court turns to the cases cited by the parties.

Plaintiff relies on *Brown v. Comm'r of Soc. Sec.*, 672 F. Supp. 2d 794 (E.D. Mich. 2009) – authored by the District Judge in this case – to support his claim of error. (Pl.'s Mot. Summ. J. at 16-17.) In *Brown*, the ALJ limited the plaintiff to "simple, routine, repetitive, one or two step tasks" but the ALJ also found that the plaintiff was "moderately impaired in his ability to maintain concentration, persistence, and pace." *Id.* at 797 (internal quotation marks omitted). The magistrate

25

judge in *Brown* was persuaded by the fact that "none of [Plaintiff's] medical or psychological treating sources suggested that Plaintiff lacked the concentration to perform unskilled one and two step work." *Id.* (citation and internal quotation marks omitted).[9]  The District Court, however, was not similarly persuaded:

> "Plaintiff may be unable to meet quotas, stay alert, or work at a consistent pace, even at simple, unskilled routine job[s]." . . .
>
> [T]his Court finds this case distinguishable from [*Smith v. Halter*] because, here, the ALJ found that Plaintiff has a "moderate limitation." In *Smith*, the plaintiff's physicians characterized his concentration problems as "minimum or negligible." . . .[10]
>
> The ALJ did not simply conclude that Plaintiff was unable to perform anything [but?] simple, routine work.  Instead, he specifically concluded that Plaintiff is "moderately impaired" in "his ability to maintain concentration, persistence, and pace."

*Id.* (emphases added).  Thus, the District Court concluded, "the ALJ's hypothetical question, to accurately portray Plaintiff's psychological impairments, had to address the frequency or consistency of Plaintiff's ability to concentrate."  *Id.*

Plaintiff also relies on *Edwards v. Barnhart*, 383 F. Supp. 2d 920 (E.D. Mich. 2005) – which

---

[9]According to the Magistrate Judge's Report and Recommendation, some of the medical evidence pertaining to the plaintiff's concentration difficulties included: (1) a medical expert who testified at the administrative hearing that while the plaintiff had moderate difficulties in CPP, he could perform one- or two-step tasks; (2) two psychiatrists who assigned moderate GAF scores; (3) a psychiatrist who found that the plaintiff had marked deficiencies in concentration and twice assigned a GAF score in the "serious" range; and (4) a state-agency physician who found that while the plaintiff had "moderate" difficulties in CPP, he could perform "unskilled tasks on a sustain[ed] basis."  *See Brown v. Comm'r of Soc. Sec.*, No. 08-12922, Dkt. 15, Magistrate Judge's Report and Recommendation at 6, 8, 11, 12 (E.D. Mich. Aug. 25, 2009).

[10]As noted, in *Smith*, the ALJ in fact found that the plaintiff "often" had difficulties in CPP. 307 F.3d at 379.  In *Edwards v. Barnhart*, 383 F. Supp. 2d 920, 930 (E.D. Mich. 2005), the court explained that the term "moderate" under the present rating scale corresponds with the prior category of "often."

26

the District Court cited in *Brown* – in support of his position.  In *Edwards*, the ALJ found that the plaintiff had a moderate deficiency in CPP, but the hypothetical only limited the plaintiff to simple, routine, unskilled work.  *Id.* at 930.  The court noted that the medical evidence pertaining to the plaintiff's mental impairments was "inconsistent." *Id.* 929.  In particular, the plaintiff testified to panic attacks that affected her concentration, a treating psychiatrist assigned a GAF range indicating serious-to-moderate psychiatric symptoms, the plaintiff's conditions were at one point "decompensating" but then improved, and a state agency physician found that while the plaintiff had severe anxiety and a moderate CPP limitation, her limitations did not preclude work.  *Id.* at 923, 926, 930.  "Given the inconsistent state of the record," the court concluded, "the ALJ's conclusions that [the] [p]laintiff is not disabled from all work due to her mental limitations is sufficiently supported by substantial evidence and should not be disturbed by this Court." *Id.* at 929.  The court made explicit, however, that the evidence indicating a minimal CPP problem was "less weighty" than that in *Smith*, and, unlike *Smith*, there was no quota limitation in the ALJ's hypothetical.  Therefore, the court concluded,

> While close, [limitations to "no more than simple, routine, unskilled work"] are not sufficient, and do not fully convey Plaintiff's limitations in concentration to the VE.  Plaintiff may be unable to meet quotas, stay alert, or work at a consistent pace, even at a simple, unskilled, routine job.  The current hypothetical question is not adequate on the issue of moderate limitations of concentration, persistence and pace for this Court to have any idea as to the number of the assembly, packing, and sorting or security guard jobs identified by the VE that would be excluded if quotas or other aspects related to moderate concentration limitations were added to the hypothetical question.

*Id.* at 930-31 (internal citations omitted).

Although not cited by Plaintiff, because the District Judge in deciding *Brown* quoted from

27

*Benton v. Comm'r of Soc. Sec.*, 511 F. Supp. 2d 842 (E.D. Mich. 2007), the Court provides a brief summary of that case.  In *Benton*, the ALJ found that the plaintiff had moderate difficulties in CPP but only limited the plaintiff to "simple, routine, repetitive" tasks.  *Id.* at 845, 849.  The evidence of a significant CPP problem was minimal, however.

> The Magistrate recognized that Plaintiff did not testify regarding any limitation in concentration, persistence, or pace; did not articulate a theory; nor point to any evidence to support any greater restrictions than those prescribed by the ALJ in the hypothetical question. The Magistrate further recognized that the administrative record lacks objective medical findings or treatment records that would support a finding of impairment in concentration, persistence, or pace.

*Id.* at 846-47.  "Despite this lack of evidence," the district court continued, "the Magistrate stated the ALJ still found that Plaintiff had moderate deficiencies in concentration, persistence, and pace. Hence, according to the Magistrate, the hypothetical question was flawed because it failed to include these deficiencies."  *Id.* at 847.  The district court agreed with the magistrate judge that the hypothetical was inadequate, and held,

> Here, the ALJ found that although Plaintiff has a moderate deficiency in her ability to maintain concentration, persistence, and pace, she is able to perform simple, routine, repetitive work. However, the limitations included in the hypothetical question and the VE's testimony regarding the effect a lack of concentration has on the jobs mentioned was insufficient to suitably accommodate Plaintiff's concentration limitations.

*Id.* at 849.

The Commissioner responds not by distinguishing *Brown* or *Edwards*, (or *Benton*) from this case but by instead pointing to case law finding that a restriction to "simple, routine" work sufficiently accounts for a claimant's moderate difficulties in concentration, persistence, or pace. (Def.'s Mot. Summ. J. at 11, 13-14.)  In particular, the Commissioner relies on the Sixth Circuit's

28

decision in *Infantado v. Astrue*, 263 F. App'x 469 (6th Cir. 2008) and two decisions from this District: *Lewicki v. Comm'r of Soc. Sec.*, No. 09-11844, 2010 WL 3905375 (E.D. Mich. Sept. 30, 2010) and *Latarte v. Comm'r of Soc. Sec.*, No. 08-13022, 2009 WL 1044836 (E.D. Mich. Apr. 20, 2009). The Court discusses these cases in turn.

In *Infantado v. Astrue*, 263 F. App'x 469 (6th Cir. 2008), the plaintiff "point[ed] to" a mental RFC completed by a state physician indicating "moderate" limitations in her ability to (1) understand, remember, and carry out "detailed" instructions, (2) maintain concentration for "extended" periods, and (3) set realistic goals and make plans independently. 263 F. App'x at 477. But the same physician ultimately concluded that the plaintiff appeared to be capable of "simple tasks on a sustained basis." *Id.* The ALJ limited the plaintiff to "unskilled" work, and the Court of Appeals, while noting that the ALJ's hypothetical "could have been more complete," found that the hypothetical did not inaccurately portray the plaintiff. *Id.*

In *Latarte v. Comm'r of Soc. Sec.*, No. 08-13022, 2009 WL 1044836 (E.D. Mich. Apr. 20, 2009), the ALJ, who found that the plaintiff had moderate limitations in CPP,[11] based his RFC findings "primarily" upon the opinions of two state physicians. 2009 WL 1044836, at *3. One DDS physician found that the plaintiff had moderate difficulties in CPP but also "retained the mental capacity to perform simple tasks on a sustained basis." *Id.* The ALJ limited the plaintiff to "simple, routine" work and the court reasoned that this accurately portrayed the plaintiff: "[u]nskilled work, by definition, is limited to understanding, remembering and carrying out only simple instructions and requiring little, if any, judgment." *Id.*

_____

[11]This finding is not recited in the court's opinion but is apparent from the ALJ's narrative found in the administrative record. *Latarte v. Comm'r of Soc. Sec.*, No. 08-13022, Dkt. 4, Administrative Record at 20 (Sept. 4, 2008).

The Commissioner also relies on *Lewicki v. Comm'r of Soc. Sec.*, No. 09-11844, 2010 WL 3905375 (E.D. Mich. Sept. 30, 2010). There, similar to all the cases discussed so far, the ALJ found that the plaintiff had moderate difficulties in CPP but the ALJ only limited the plaintiff to simple, routine work. *Id.* at *2. The plaintiff argued that "[b]y failing to appropriately consider the mental limitations she herself set forth, the ALJ erred as a matter of law in failing to adequately formulate plaintiff's RFC." *Id.* at *2. The medical evidence supporting a significant problem in CPP was not great, however. In particular, the plaintiff indicated that he did not have problems paying attention, that he took no medications for his depression or anxiety, and that he had not sought mental-health services. 2010 WL 3907049, at *3, *8 (E.D. Mich. Aug. 23, 2010) (magistrate judge's report and recommendation). And a state-agency physician opined that while the plaintiff had moderate difficulties in CPP, he could perform unskilled tasks on a sustained basis. *Id.* at *9. On the record before it, the court concluded that the hypothetical was sufficient to account for the plaintiff's CPP problems:

> There may be cases where such moderate limitations preclude the performance of even some simple, unskilled tasks. Plaintiff does not, however, explain why the facts of this particular case require a more detailed hypothetical question to adequately account for his own moderate limitations in concentration, persistence, or pace. . . . Plaintiff never explains how the facts of his case are more like the facts of *Brown* and [*Edwards v.*] *Barnhart* than other cases from this District that have reached the opposite conclusion. In *Latare* . . . [the court] concluded that the ALJ adequately considered Plaintiff's "significant" mental impairments by limiting her to simple unskilled work. *See also Infantado* . . . .

> [The magistrate judge] correctly concluded that the ALJ's decision was supported by substantial evidence. . . . First, Plaintiff's objection ignores a particularly compelling piece of evidence provided by the same state psychologist who diagnosed Plaintiff's mental limitations in the first place. The psychologist diagnosed moderate mental impairments, but also concluded that Plaintiff's mental limitations

30

would not prohibit him from performing simple, unskilled work. Moreover, the ALJ supplemented her hypothetical question by inquiring how often Plaintiff could be absent from the available jobs and whether the jobs would require him to work consistent eight-hour shifts. These specific questions account for Plaintiff's limitations as to concentration, punctuality, and attendance.

2010 WL 3905375, at *3 (E.D. Mich. Sept. 30, 2010) (citation to administrative record omitted).

Although the forgoing authorities are somewhat difficult to reconcile, the Court offers the following collective reading of the precedents. Beginning with the similarities, in *Brown*, *Edwards*, and *Benton*, as well as *Lewicki* and *Latarte*, an ALJ made a finding that the plaintiff had "moderate" difficulties in CPP. And, in each of those cases, the ALJ did not include specific CPP language in the hypothetical to the VE and instead used more general vocational terms such as "unskilled" or "simple, routine." But, it appears that under *Brown*, *Edwards*, and *Benton*, unless the medical evidence clearly demonstrates otherwise, *see, e.g.*, *Smith v. Halter*, 307 F.3d 377 (6th Cir. 2001), once an ALJ makes a finding that the claimant has moderate difficulties in CPP, it is inconsistent for the ALJ not to account for his own finding in the hypothetical with language more CPP-specific than "unskilled" and/or "simple." In *Edwards*, it was not sufficient that a state physician found that "Plaintiff's anxiety was severe, but did not prevent her from working" – at least where another physician had assigned a GAF score indicating serious-to-moderate symptoms. 383 F. Supp. 2d at 929-30. And in *Brown*, it was not sufficient that "none of [Plaintiff's] medical or psychological treating sources suggested that Plaintiff lacked the concentration to perform unskilled one and two step work." 672 F. Supp. 2d at 797 (internal quotation marks omitted). And, at least according to the magistrate judge, the administrative record in *Benton* "lack[ed] objective medical findings or treatment records that would support a finding of impairment in concentration, persistence, or pace." 511 F. Supp. 2d at 846. Turning to the Commissioner's cases, *Infantado*, *Latarte*, and *Lewicki* could

31

be read as consistent with *Brown* and *Edwards* (but perhaps not *Benton*) because the evidence indicating a significant CPP problem was probably less substantial in the former three cases. For instance, in *Lewicki*, the plaintiff took no medications for his depression or anxiety and had not sought mental-health services. Further, in each of *Infantado*, *Latarte*, and *Lewicki*, a state physician who found moderate CPP problems ultimately concluded that the claimant could work. But if a distinction between Plaintiff's and the Commissioner's cases must be drawn, it may simply be that under *Brown* and *Edwards*, and more certainly *Benton*, once an ALJ has made a moderate CPP finding, there must be very strong evidence of insignificant CPP problems before non-CPP-specific terms like "unskilled" are deemed to accurately portray the claimant. Otherwise, under those cases, it is inconsistent for the ALJ to find moderate CPP difficulties on the one hand yet fail to adequately account for them in the hypothetical on the other.

On the record before it, this Court finds the following reasoning from *Brown* equally applicable :

> [T]his Court finds this case distinguishable from [*Smith v. Halter*] because, here, *the ALJ found that Plaintiff has a "moderate limitation."* In *Smith*, the plaintiff's physicians characterized his concentration problems as "minimum or negligible."

672 F. Supp. 2d at 797. In fact, at Step Three of his disability determination, the ALJ found – independent of Drs. Blake's or Guy's RFC assessments – that the evidence in the record demonstrated that Plaintiff had non-negligible – indeed, moderate – difficulties in CPP:

> With regard to concentration, persistence or pace, the claimant has moderate difficulties. According to the claimant's treatment records, the claimant has complained of feeling unmotivated, hopeless, and helpless. During alleged manic periods, the claimant has stated that he is "hyper verbal" and unable to go to sleep. The claimant's records, however, do not indicate that the claimant experiences "marked" or "extreme" limitations in this functional category. At a

32

> December 2009 psychiatric evaluation, the claimant's global memory
> was described as "essentially intact." Notes from an April 2009
> mental status examination state that the claimant possessed average
> intelligence, and his recent and remote memory was noted to be
> intact.

(Tr. 17 (citations to the record omitted).) Had the ALJ instead relied on Dr. Blake's PRTF or Mental

RFC Assessment in making his Step-Three determination, Dr. Blake's ultimate conclusion about

Plaintiff's ability to work despite mental limitations would carry more weight. But he did not.

Rather, it was the ALJ's independent review of the evidence that Plaintiff did not have insignificant

difficulties in CPP. *Cf. Lewicki*, 2010 WL 3907049, at *2 (magistrate judge's report) (noting that

plaintiff argued that the ALJ noted that her B-criteria findings were consistent with that of state

physician and Commissioner argued that the ALJ was "tracking" the state physician's B-criteria

findings). To this, the Court adds that the evidence showing insignificant CPP problems in this case

is not as overwhelming as in *Smith* or even *Lewicki*. For instance, here, as opposed to in *Lewicki*,

Plaintiff has sought and received mental-health treatment for extended periods and has been

prescribed medications for his mental impairments.

Therefore, following *Brown*, it appears that the ALJ was left with two permissible choices.

The ALJ could have explained in his narrative, with references to the record, how, despite Plaintiff's

"moderate" difficulties in CPP, he retained sufficient concentration, persistence, and pace to perform

each of the requirements of unskilled work.[12] Or, as the District Court found in *Brown*, the ALJ

---

[12]The Social Security Rulings provide that unskilled work involves: (1) "Understanding, remembering, and carrying out simple instructions"; (2) "Making judgments that are commensurate with the functions of unskilled work—i.e., simple work-related decisions;" (3) "Responding appropriately to supervision, co-workers and usual work situations"; and (4) "Dealing with changes in a routine work setting." S.S.R. 96-9p, 1996 WL 374185 at *9; *see also* S.S.R. 85-15, 1985 WL 56857, at *4.

could have "address[ed] the frequency or consistency of Plaintiff's ability to concentrate" in his hypothetical and RFC Assessment. Because the ALJ did neither of these, remand is warranted.

Given that remand is necessary for the ALJ to further address Plaintiff's ability to maintain CPP, the Court will more expeditiously address the broader version of Plaintiff's present argument. Plaintiff argues that the ALJ "compounded" his CPP error "by failing to take into account testimony from the VE that limitations consistent with the opinions voiced by several medical sources would have precluded plaintiff's engagement in competitive employment." (Dkt. 12, Pl.'s Resp. to Def.'s Mot. Summ. J. at 5.) The VE testified that if Plaintiff (1) could not concentrate for 15 minutes out of every hour, (2) had to miss work two days a month, (3) could not "deal with anybody any time," or (4) could not adapt to more than a couple of job changes per month that Plaintiff would be precluded from work. (Tr. 65-66.) But the Court has already concluded that the ALJ reasonably rejected Dr. Guy's opinion. Drs. Mahajan and Hasan did not complete RFC assessments of Plaintiff. And while they provided GAF scores that indicate moderate symptoms generally, those scores do not necessarily indicate problems in these four specific vocational areas. Dr. Blake found that Plaintiff had (1) only moderate difficulties working in coordination with others, (2) no significant limitations in interacting with the general public, (3) no significant limitations in adapting to changes in the work setting, and (4) never quantified his finding (e.g., two days per month) that Plaintiff was moderately limited in his ability to complete a normal workweek without interruptions from psychologically-based symptoms. (Tr. 312-13.) Accordingly, the Court disagrees with Plaintiff that the ALJ committed reversible error in failing to acknowledge that several medical sources found limitations consistent with those the VE indicated would be work preclusive.

Plaintiff also argues that the ALJ's limitation of "simple, unskilled" work fails to account

34

for Plaintiff's testimony that he experiences irritability, dizziness, and headaches due to his medication.  (Pl.'s Mot. Summ. J. at 17-18; Pl.'s Resp. to Def.'s Mot. Summ. J. at 6 (citing Tr. 46).)  But "[a]llegations of a medication's side effects must be supported by objective medical evidence." *Hamper v. Comm'r of Soc. Sec.*, 714 F. Supp. 2d 693, 707 (E.D. Mich. 2010) (internal quotation marks and citations omitted); *see also Farhat v. Sec'y of Health & Human Servs.*, 972 F.2d 347 (table), 1992 WL 174540, *3 (6th Cir. July 14, 1992); *cf.* S.S.R. 96-7p, 1996 WL 374186 at *2 (providing that in assessing a claimant's credibility, "the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s) – i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques – that could reasonably be expected to produce the individual's pain or other symptoms.").  Here, as the Commissioner correctly argues, Plaintiff has pointed to no medical evidence supporting his allegations of irritability, dizziness, and headaches due to medication.  In fact, on May 14, 2008, a New Center social worker indicated that Plaintiff was "[m]edication compliant, no side effects to report."  (Tr. 396.)  To the extent that Plaintiff would rely on Dr. Guy's December 2009 evaluation, that reliance would be misplaced.  Dr. Guy indicated that when Plaintiff first attended Easter Seals in April 2009, he prescribed medication for Plaintiff's insomnia which reportedly caused Plaintiff to sleep "for 24 hours a day" and feel "lightheaded and dizzy."  (Tr. 536.)  But Dr. Guy also noted that he changed Plaintiff's medication because of these side effects.  (Tr. 536.)  Although Dr. Guy noted that the medication change caused Plaintiff to sleep only about four hours a day – Dr. Guy did not mention continued symptoms of drowsiness, lightheadedness, or dizziness.  (Tr. 536.)[13]

---

[13]And, regarding Plaintiff's insomnia, Dr. Guy recommend that Plaintiff take his medication for drowsiness in the morning rather than at night.  (Tr. 537.)  Although Plaintiff testified that this change had not cured his sleeping problems, the hearing before the ALJ was at most a week after

35

### G.  Conclusion

For the foregoing reasons, this Court finds that, without a more detailed explanation from the ALJ regarding his finding that Plaintiff has moderate limitations in concentration, persistence, or pace, his hypothetical and RFC assessment did not accurately capture that limitation. Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be GRANTED IN PART, that Defendant's Motion for Summary Judgment be DENIED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner be REMANDED.

## III.  FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation.  *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97.  Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office.  *See* E.D. Mich. LR 5.1.  A copy of any objections is to be served upon this magistrate judge but this does not constitute filing.  *See* E.D. Mich. LR 72.1(d)(2).  Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be

---

Dr. Guy recommended the change.  (*Compare* Tr. 32 (indicating December 11, 2009 hearing) *with* Tr. 536 (dated December 4, 2009) and Tr. 537 (dated December 9, 2009).)  And Plaintiff's follow-ups with Dr. Guy for a medication reviews were to be once every four to twelve weeks.  (Tr. 537.)

filed within seven (7) days of service of the response.  E.D. Mich. LR 72.1(d)(3), (4).


s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated:  December 1, 2011


## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on December 1, 2011.


s/Jane Johnson
Deputy Clerk